**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


WILLIAM A. WEIS,                     )
                                     )
                  Plaintiff,         )     Civil Action No. 04-52
                                     )
      v.                             )     Judge Cercone
                                     )     Magistrate Judge Caiazza
ADVANCED CONSTRUCTION                )
SERVICES, INC.,                      )
                                     )
                  Defendant.         )


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.   RECOMMENDATION**

     For the reasons stated below, it is respectfully recommended

that the Defendant's Motion for Summary Judgment (Doc. 12) be

granted.

**II.   REPORT**

**BACKGROUND**

**1.  Procedural History**

     On January 15, 2004, William A. Weis ("the Plaintiff")

commenced this civil action against his former employer, Advanced

Construction Services, Inc. ("ACS" or "the Defendant"), for

failure to pay overtime compensation in violation of the Fair

Labor Standards Act ("the FLSA"), 29 U.S.C. Sections 201, *et seq.*

*See generally* Compl. (Doc. 1).

     The Defendant filed a Motion for Summary Judgment ("the

Defendant's Motion"; Doc. 12) on December 2, 2004, asserting that

the Plaintiff is covered by the "administrative" exemption to the

FLSA overtime pay requirements.  *See generally* Def.'s Mem. in Supp. of its Mot. for Summ. J. (Doc. 13; hereinafter cited as "Def.'s Br.") at 3-14; *see also* 29 U.S.C. § 213(a)(1) (overtime pay provisions "shall not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity . . .").[1]  The briefing has come to a close, and the Defendant's Motion is now ripe for adjudication.

**2.  Facts**

ACS is a construction management company that builds retail stores and restaurants throughout the United States.  *Compare* Def.'s Statement of Undisputed Material Facts in Supp. of its Mot. for Summ. J. (Doc. 14; hereinafter cited as "Def.'s Facts") ¶ A.1 *with* Pl.'s Concise Statement of Material Facts in Response to that of Advanced Construction Services, Inc. (Doc. 16; hereinafter cited as "Pl.'s Facts") ¶ A.1.  The Plaintiff was employed as Chief Estimator and participated in the preparation of approximately 1100 estimates used by ACS in creating competitive bids on prospective jobs.  *Compare* Def.'s Facts ¶ B.1 *with* Pl.'s Facts ¶ B.1; *see also* Dep. of William A. Weis, Volume III (attached as Ex. 4 to Def.'s Facts; hereinafter cited as

---

[1]  The Defendant also claims that the Plaintiff qualifies under the Motor Carrier Act exemption for "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service . . . ."  *See generally* Def.'s Br. at 14-17; *see also* 29 U.S.C. § 213(b)(1).  As the undersigned concludes that the Plaintiff is exempt as an administrative employee, however, this contention need not be addressed in the analysis that follows.  *See generally* discussion *infra*.

"Weis Dep. III") at 200.

In general, the majority of the Plaintiff's job comprised basic estimating or "take-off" work – that is, reviewing building plans submitted by clients, determining the types of subcontractors or "disciplines" that were needed to perform the work, and calculating the costs of the labor and materials needed for each discipline.  *See* Weis Dep. III at 182, 201-202 (seventy-five percent of the Plaintiff's work was estimating and take-off work); *see also id.* at 180, 187 (explaining "take-off" process). The Plaintiff would create "means sheets" for each discipline that would identify a description of the necessary work in a given area and estimate its total price.  *See id.* at 173.  The Plaintiff estimated the total price by "coming up with quantities for all the different disciplines . . . [and] multipl[ying] it by a unit price."  *See id.* at 173.

The estimation process, however, was not simply a rote exercise.  In reviewing the building plans, it was incumbent upon the Plaintiff "to note missing information from the drawings . . . , formulate questions to obtain the needed information, [and] contact the client or architect to get the information to do [the] estimates."  *Compare* Def.'s Facts ¶ D.III.15 *with* Pl.'s Facts ¶ D.III.15 (admitting same) *and* Dep. of William A. Weis, Volume I (attached as Ex. 2 to Def.'s Facts; hereinafter cited as "Weis Dep. I") at 188-90 (stating roughly

same); *see also id.* at 173 (stating that it was part of the Plaintiff's job to "look at the plan[s] to determine if there w[ere] . . . gaps . . . [such as] additional construction or other facilities [that] needed to [be] suppl[ied] . . ."); Dep. of William A. Weis, Volume II (attached as Ex. 3 to Def.'s Facts; hereinafter cited as "Weis Dep. II") at 123 (agreeing that "[m]any times" in the review process, the estimator would be required to "come up with what might be necessary, what[] [had been] omitted from the drawings, what [he] might think might be necessary, and then either . . . go get it or [have] somebody else go get it . . ."); *see also, e.g.*, Weis Dep. II at 115-16 (specific examples of omissions in plans).  The record is replete with multiple examples of correspondences between the Plaintiff and ACS's clients seeking to obtain or verify information about various construction sites.  *See, e.g.*, Dep. Exs. 52, 51, 45 (attached to Weis Dep. II) (various letters to clients seeking information and/or additional drawings); *see also, e.g.*, Dep. Ex. 41 (attached to Weis Dep. II) (document listing questions directed to architect).[2]

The Plaintiff was also responsible for locating and

---

[2]   The Plaintiff would also make site visits to gather further relevant information and clarify information in the drawings.  *See* Weis Dep. II at 123 (admitting that "site visits w[ere] part of [the Plaintiff's] duties at times . . ."); *see also* Weis Dep. I at 87-91 (explaining general protocol and purpose of site visits).  On several occasions, the Plaintiff directed other employees to make visit sites on his behalf.  *See* Weis Dep. II at 119-20, 174.

contacting subcontractors and material suppliers in the areas where work was to be performed.  *See* Weis Dep. III at 264 (admitting that job duties entailed "f[i]nd[ing] subcontractors and sen[ding] out requirements . . . and bid requests"); *compare also* Def.'s Facts ¶¶ C.25-26 *with* Pl.'s Facts ¶¶ C.25-26 ("It is admitted that Weis contacted suppliers of materials and services to get prices for items needed for [a] project").  In creating a list of possible subcontractors and suppliers, the Plaintiff relied on lists of professionals ACS had used on past jobs, the yellow pages, and other databases, including Internet directories.  *Compare* Def.'s Facts ¶¶ C.15-16 *with* Pl.'s Facts ¶¶ C.15-16; *see also* Aff. of Pamela Prokepec (attached as Ex. 5 to Def.'s Facts; hereinafter cited as "Prokepec Aff.") at 2-3 (explaining process used to identify subcontractors for prospective jobs); Aff. of Richard Cerminaro (attached as Ex. 6 to Def.'s Facts; hereinafter cited as "Cerminaro Aff.") at 2-3 (same).  The Plaintiff also created and maintained a "subcontractor evaluation log" that included names, addresses, phone numbers, and evaluations of subcontractors that had been used.  *See* Weis Dep. I at 95-97 (explaining how Plaintiff assembled information for log).

Once the Plaintiff identified three subcontractors for a given discipline, he contacted each one to determine: "(1) if they were available[;] (2) if they were interested in bidding on

the job[;] and (3) if they were insured."  *See* Aff. of William

Weis (attached as Ex. 4 to Pl.'s Facts) at 3.  The Plaintiff

would then send the prospective subcontractors a scope of work

document that delineated the work to be performed.  *See* Weis Dep.

III at 127-28.[3]

Once the subcontractors submitted bids, the Plaintiff was

then charged with the duty of "qualifying" them.  *See* Weis Dep.

III at 264 (admitting that job responsibilities included

"qualif[ying] subcontractors' prices"); *see also generally* Weis

Dep. I at 163-65.  The qualification process generally entailed

contacting the subcontractors to determine whether the bid was

subject to any special exclusions or reservations and to confirm

that the subcontractors has properly evaluated the scope of work.

*See* Weis Dep. I at 163-64 (explaining that, for example, "if a

[subcontractor] sa[id] he[] [wa]s excluding electrical service, I

would write down [']excludes electrical service['] . . ."); 

*Compare* Def.'s Facts ¶ C.29 (noting Plaintiff's responsibility to

"determine if the scope of work each subcontractor [wa]s to do

ha[d] beed correctly evaluated by the subcontractor") *with* Pl.'s

Fact ¶ C.29 (admitting same).

During this process, the Plaintiff made subjective

"judgments" as to whether the bids were adequate by comparing

---

[3]   The Plaintiff approximates that of the projects he was assigned to, he
generated between one-third and forty percent of the scope of work forms.  *See
id.* at 128.  The remaining forms were generated by other individuals – either
expediters or assistant project managers.  *See id.* at 125-129.

them against his own estimates.  *See* Weis Dep. I at 169-170.   In

some instances, the Plaintiff negotiated with the subcontractors

as to their quoted price.  *See id.* at 167 (objecting to the use

of the word "negotiate," but admitting that he "told [the

subcontractors] their price was too high" and that they gave him

"different prices").  The Plaintiff then memorialized the

relevant qualifications on a bid sheet form and submitted it to

the Project Manager.  *See id.* at 163-65.[4]

    The Plaintiff engaged in a similar process with respect to

material suppliers.  *See generally id.* at 175-180.  The Plaintiff

testified that the process of obtaining suppliers, however, was

less complex.  *See id.* at 180 ("You usually had a lot more

questions to ask the subcontractors than . . . the material

suppliers[:] [m]aterial costs were pretty cut and dry").

    After the Plaintiff gathered all the information from the

subcontractors and material suppliers, he compiled a final "job

cost sheet" – that is, the Plaintiff's determination "as to what

the bid price should be without [a] profit margin" – that he

presented to the Project Manager for approval.  *See* Prokopec Aff.

at 4; Cerminaro Aff. at 4; *compare* Def.'s Facts ¶ C.31 *with* Pl.'s

Facts ¶ C.31; *see also generally* Weis Dep. III at 127 (explaining

sources of information assembled in job cost sheet).  The Project

Manager would review the job cost sheet item-by-item, make

---

[4]  The Project Manager rendered the ultimate decision as to which of the
subcontractors identified in the bid sheet would be utilized.  *See id.*

various changes,[5] and determine the final markup for the overall

project.[6]   *See* Weis Dep. I at 138-40; Weis Dep. II at 126-127.

Once approved, a bid was sent to the customer and committed ACS

to do the job at the offered price.   *See* Prokepec Aff. at 4;

Cerminaro Aff. At 4.

**ANALYSIS**

Under the FLSA, the Plaintiff qualifies as a "bona fide

administrative employee" if his primary duty: (1) consisted of

"work directly related to management policies or general business

operations of the employer"; and (2) "requir[ed] the exercise of

discretion and independent judgment."   *See* Martin v. Cooper Elec.

Supply Co., 940 F.2d 896, 901 (3d Cir. 1991) (citation omitted).

It is undisputed that the Plaintiff's primary job duties

entailed preparing estimates used to bid on projects and

contacting subcontractors and suppliers.   *See* discussion *supra*.

As a matter of law, these types of duties are "directly related"

to the Defendant's general business operations of providing

construction services.   *See, e.g.*, Reyes v. Hollywood Woodwork,

Inc., 360 F.Supp.2d 1288, 1291-92 (S.D. Fla. 2005) (preparation

---

[5]   The Plaintiff testified that the Project Manager would change anywhere from twenty-five to one-hundred percent of the underlying "raw data" presented in the job cost sheet; however, he could not recall any specific project where one-hundred had been changed.   *See* Weis Dep. I at 140; Weis Dep. III at 242-244.   He also admitted that, on at least a few occasions, no changes were made.   *See* Weis Dep. III at 242.

[6]   The Plaintiff stated that he did, however, weigh in on this decision.   *See* Weis Dep. III at 247-48 ("I would say[,] [for example,] . . . '[C]ould you lower the profit margin on this job four percent or two percent? I would really like to see [ACS] get this job.'").

of estimates used to formulate bids were "directly related" to architectural woodwork manufacturer's general business operations); Wells v. Radio Corporation of Am., 77 F.Supp. 964, 971 (S.D.N.Y. 1948) (cost estimators' duties were directly related to employer's management policies and/or general business operations); Washleski v. RTL Constr., Inc., 2003 WL 23741863, *5 (Minn. Dist. Ct. Aug. 29, 2003) (same).  Thus, the court proceeds to the second prong of the analysis.  *See* discussion *supra*.

In a recent decision, the United States District Court for the Southern District of Florida held that a cost estimator whose job was "to review a given set of architectural drawings and estimate the costs for the various wood materials and labor that would accomplish building and installing the particular woodwork contemplated by the plans at a competitive price" exercised discretion and independent judgment in performing his work duties.  *See* Reyes, 360 F.Supp.2d at 1289, 1293.  The court reasoned that the plaintiff "utilized judgment in [among other things] selecting which fabrication method to use to compute the labor cost part of the bid . . . [it] [wa]s not simply picking numbers from a book and plugging them into a computer program." *See id.* at 1293 (citations omitted).

The United States District Courts for the Southern District of New York and Northern District of Illinois have reached similar conclusions.  *See, e.g.,* Wells, 77 F.Supp. at 971; Walsh v. Brad Foote Gear Works, Inc., 14 Wage & Hour Cas. (BNA) (N.D.

Ill. 1959).   In <u>Wells</u>, for example, the court decided that "Cost Estimators" were properly classified as administrative employers, stating:

> It was their duty and responsibility to assemble, correlate and interpret all the data necessary to estimate cost; they were also required to take into consideration the type of tool needed for the particular quantity, the scheduled rate of delivery for the particular job involved and to check to make sure that the necessary facilities were available inside the plant or elsewhere. Their conclusions and recommendations were used in establishing sale prices, in making decisions as to whether or not the Company would manufacture certain articles, in submitting or considering bids, and in cost accounting. At times a few of them were called upon to make field trips with other representatives of the Company.

*See id.,* 77 F.Supp. at 971.

These cases are well-reasoned and directly on point; the undersigned therefore follows them in concluding that the Plaintiff exercised discretion and independent judgment in the performance of his duties.

The Plaintiff's reference to <u>Wirtz v. Burk Builders, Inc.</u>, 1964 U.S. Dist. LEXIS 7580 (S.D. Fla. Aug. 7, 1964) does not persuade the court otherwise.  *See* Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. (Doc. 15; hereinafter cited. as "Pl.'s Br.") at 11.  Although <u>Wirtz</u> concluded that an estimator was *not* exempt as an administrative employee under the FLSA, the court did not articulate the basis of its decision or engage in any analysis whatsoever.  *See id.* 9-12.  Moreover, there is no indication that the <u>Wirtz</u> court even considered the "discretion" issue.  *See id.*

10

Nor does the fact that the Plaintiff's estimates were subject to final review by a Project Manager mean that the Plaintiff did not exercise discretion and independent judgment. *Compare* Pl.'s Br. at 9 (arguing absence of discretion because that Plaintiff's work was subject to "adjustments" by Project Managers) *with* <u>Reyes</u>, 360 F.Supp.2d at 1293 ("[T]he fact that [the] [d]efendants' management was responsible for the bottom line of the bid[] does not mean that [the] [p]laintiff did not exercise discretion and independent judgment.").

In sum, the court concludes that the Defendant has met its burden of demonstrating that the Plaintiff was an exempt administrative employee under the FLSA.  *See generally* <u>Martin</u>, 940 F.2d at 900 (noting that defendant bears burden of proving FLSA exemptions).

## III.  <u>CONCLUSION</u>

For the reasons stated above, it is recommended that the District Court grant the Defendant's Motion for Summary Judgment (Doc. 12).

In accordance with the Magistrates Act, 28 U.S.C. § 636(b) (1) (B) and (C), and Rule 72.1.4 (B) of the Local Rules for Magistrates, objections to this Report and Recommendation are due by September 5, 2005.  Response to objections are due by September 15, 2005.

August 19, 2005

Francis X. Caiazza
U.S. Magistrate Judge

11

cc:

Andrew M. Stone, Esq.
828 Frick Building
437 Grant Street
Pittsburgh, PA 15219

John R. Linkosky, Esq.
715 Washington Avenue
Carnegie, PA 15106